(637 P.2d 437)
No. 52,612

ARTHUR P. PEASLEY, *Appellant,* v. TELECHECK OF KANSAS, INC., *Appellee.*

Opinion filed December 3, 1981.

*Kris L. Arnold,* of Roeland Park, for appellant.

*J. Steven Schweiker,* of David R. Gilman & Associates, of Overland Park, for appellee.

Before JUSTICE FROMME, presiding, PARKS, J., and B. MACK BRYANT, District Judge Retired, assigned.

FROMME, J.: Plaintiff Arthur P. Peasley filed the present case against TeleCheck of Kansas, Inc., based on three claims. The first claim was brought under the Fair Credit Reporting Act, K.S.A. 50-701 *et seq.,* the second was under the Fair Debt Collection Practices Act, 15 U.S.C.A. § 1692 *et seq.* (1981), and the third was a common law claim for relief based on wrongful debt collection practices. The district court sustained a summary judgment in favor of the defendant and against the plaintiff on all

three claims. Plaintiff appeals and we will examine each of these three claims in the order above mentioned.

The Fair Credit Reporting Act (FCRA) was enacted and became effective in Kansas January 1, 1974. Since that time the appellate courts of this state have had little or no occasion to consider the Act. The only reported case in which the act was discussed is *Kansas Commission on Civil Rights v. Sears, Roebuck & Co.*, 216 Kan. 306, 320, 532 P.2d 1263 (1975). Consideration of the Kansas FCRA in that case was limited. The court merely determined that furnishing credit reports in response to a court order issued by a court having proper jurisdiction would not subject a person to civil penalties under the Act.

The purpose of this Act as stated in K.S.A. 50-701(*b*) is as follows:

"(*b*) It is the purpose of K.S.A. 50-701 to 50-722, inclusive, and amendments thereto, to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of such sections of this act."

This Act first defines various words and phrases including "consumer report" and "consumer reporting agency." Then follows a list of permissible purposes for furnishing the reports, a list of items of obsolete information which must be omitted from these reports, and various requirements are listed to be observed by every consumer reporting agency. Procedures to be used are outlined for those cases where the accuracy of a consumer report is disputed. Civil penalties are provided for negligent noncompliance and criminal penalties are provided for willful violations of the Act.

We turn now to the facts leading to this appeal. TeleCheck is a service organization whose business is guaranteeing checks to its merchant subscribers. TeleCheck also offered a service called "Rent Check" in which it guaranteed payments of rent to apartment owners. TeleCheck maintains a negative information file in a computer data base on individuals whose checks have been dishonored by banks and whose rent payments have not been paid when due. TeleCheck enters into a contract with a subscriber merchant in which TeleCheck will guarantee for a fee the payment of certain checks approved by TeleCheck which the merchant accepts. TeleCheck also turns down certain checks

from individuals whose names appear in the negative information computer data base it maintains. The procedure is as follows:

When a check is presented to a merchant subscriber, the merchant calls TeleCheck by telephone and gives the check maker's name and the identification number on the bank check to an audio response computer. If there is no negative information on the maker of the check in the computer data base, the computer will respond with a numerical code number, which in effect approves the individual's check for payment. If there is negative information on the maker in the data base, the computer transfers the merchant's call to a human operator. The human operator turns the check down by using numerical code numbers. The final decision to accept or reject the check is then up to the merchant.

The human operator does attempt to update the information in the computer data base covering the maker of the check. Address, telephone number, and other information is gathered and the data base is corrected when necessary. The merchant receives from TeleCheck nothing more than a computerized approval code number or a disapproval code number.

In plaintiff's case, his name and identification numbers became part of the computer base and were placed in the negative information file by reason of a rent dispute he had had with Fairfield Apartments. At that time TeleCheck also operated a similar service on rental dealings between landlords and tenants. Plaintiff and the Fairfield Apartment manager had had a misunderstanding over terminal rent due from plaintiff when he moved out of the apartment. Plaintiff believed he had an agreement with the manager to apply the security deposit on the last month's rent, but the manager turned his name in to Rent Check and claimed a short rent payment of $145.00. TeleCheck made repeated attempts to collect this amount by letter, by post card, and by telephone.

Plaintiff, apparently, had never written a bad check in his life. The rent dispute was never solved and TeleCheck knew the rent amount it claimed was being disputed by plaintiff. From the deposition testimony of the TeleCheck employees it appears that TeleCheck did not distinguish a rent dispute from a bad check when operating the negative information base. It has since discontinued Rent Check and has removed instances of nonpayment of rent from the negative information base.

Plaintiff identifies four checks which he attempted to negotiate to merchants in the area and the merchants refused to accept the checks in payment of personal consumer items purchased by plaintiff.

The trial court entered summary judgment in favor of defendant, specifically holding that the service rendered by TeleCheck concerning checks did not come within the scope of the Fair Credit Reporting Act (FCRA), and therefore, no violations of the Act could occur. The validity of that decision depends on answers to two questions: (1) Is TeleCheck a "consumer reporting agency?" and (2) does the computer based audio reporting service of TeleCheck distribute "consumer reports?"

K.S.A. 50-702(*e*) provides:

"(*e*) The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

The word "person" is defined in subsection (*a*) to include individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or any other entity.

K.S.A. 50-702(*c*) provides:

"The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes, or employment purposes, or other purposes authorized under K.S.A. 50-703. The term does not include (1) any report containing information solely as to transactions or experiences between the consumer and the person making the report; (2) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device; or (3) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys that decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made and such person makes the disclosures to the consumer required under K.S.A. 50-714."

Kansas has but one case interpreting the provisions of this Act.

It should be noted, however, that there is a federal counterpart to the Kansas FCRA. It appears in 15 U.S.C.A. § 1681 *et seq.,* and a comparison of the two Acts, including the effective dates of the Acts, indicates that the 1974 Kansas FCRA is modeled closely after the 1971 federal Act. Therefore, case law interpreting the federal Act, although not controlling, is persuasive.

*Greenway v. Information Dynamics, Ltd.,* 524 F.2d 1145 (9th Cir. 1975), is a one paragraph opinion affirming a lower court's decision holding that a report on the previous issuance of an unpaid check taken from check lists maintained by a reporting agency is a "consumer report" under 15 U.S.C.A. § 1681a (d). The definition appearing in 15 U.S.C.A. § 1681a (d) is identical to that in K.S.A. 50-702(c). It was held in *Greenway* that such a report subjected the issuer to the requirements of the Federal Fair Credit Reporting Act as a "consumer reporting agency." This holding was based on a finding that such a report bears on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, and personal characteristics.

In *Howard Enterprises, Inc., et al.,* 93 F.T.C. 909 (1979), the Federal Trade Commission agrees with the *Greenway* court. However, the decision of the administrative law judge rejected the *Greenway* decision (93 F.T.C. 924), and concluded that it was improper to construe § 1681b (3) (E) so broadly since in the judge's opinion these check lists were the same as protective bulletins recognized as exempt in the legislative history of the Act. Upon review by the Federal Trade Commission, the general findings of the administrative law judge were accepted but the Commission held it had jurisdiction over Howard Enterprises' activities.

The check lists in the *Howard* case were derived from "report cards" which participating merchants sent to Howard Enterprises periodically. These cards were the only information received on the bad check writers. Howard Enterprises did not obtain any independent verification on the individuals involved. The only mechanism for correcting or updating the list was for the subscribers to mail a post card requesting deletion of a name.

On the key issue in *Howard,* whether the company came within the FCRA, the Federal Trade Commission reversed the administrative law judge, 93 F.T.C. at 932. The Commission concluded

these check lists were "consumer reports" as defined in the federal FCRA.

In *Howard* it is stated:

"Judicial decisions support our conclusion that the FCRA applies in this case. For example, the facts in *Greenway v. Information Dynamics Ltd.,* 399 F. Supp. 1092 (D. Ariz. 1974) *aff'd* 524 F.2d 1145 (9th Cir. 1975), are virtually identical to the facts in this case. In *Greenway,* the defendant distributed to subscribing merchants the following information concerning consumers who allegedly passed bad checks: their names, drivers' license numbers, checking account numbers, number of checks returned, and, in some cases, the reasons for the return of the checks. There, the Court of Appeals for the Ninth Circuit concluded that such information constitutes a 'consumer report,' as defined in the FCRA. *See also Belshaw v. Credit Bureau of Prescott,* 392 F. Supp. 1356 (D. Ariz. 1975); *Beresh v. Retail Credit Co.,* 358 F. Supp. 260 (C.D. Cal. 1973)." 93 F. T. C. at 934.

The trial court in our present case appears to have relied on the administrative law judge's decision before that decision was reviewed by the Federal Trade Commission. It also relied on *Pembleton, et al. v. TeleCheck Washington, Inc.,* No. 78-350-A (E.D. Va. 1978), an unreported, unappealed case. The latter case involved the identical check guarantee services discussed in this case, except in *Pembleton,* the computer data base did not include Rent Check data as in our present case. In *Pembleton* summary judgment was sustained against allegations of violations of the FCRA. No formal decision was filed. A transcript of the proceedings indicates that for reasons stated from the bench the summary judgment was ordered because a check was held to be a "credit transaction" and under 15 U.S.C.A. § 1681a (d) (3) (C) an exemption is provided for credit-granting institutions. 15 U.S.C.A. § 1681a (d) (3) (C) contains the same wording and recognizes the same kind of an exemption as does K.S.A. 50-702(*c*)(3). This subsection provides that the term "consumer report" does not include:

"(3) [A]ny report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys that decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made and such person makes the disclosures to the consumer required under K.S.A. 50-714." K.S.A. 50-702(*c*)(3).

The *Pembleton* court concentrated on TeleCheck's check guarantee service, rather than its information gathering activities, and concluded that TeleCheck fell within the exception of § 1681a (d) (3) (C), which is identical to that in K.S.A. 50-702(*c*)(3), because it

indirectly granted credit when a guaranteed check was dishonored for payment.

We find it extremely difficult to fit TeleCheck's services into that exception. It appears that the exception contemplated by K.S.A. 50-702(*c*)(3) and its federal counterpart 15 U.S.C.A. § 1681a (d) (3) (C) was made for finance companies or banks, a fact of which the *Pembleton* court did not seem to be aware.

In Division of Credit Practices, *Compliance with the Fair Credit Reporting Act* reported in 5 Cons. Cred. Guide (CCH) ¶ 11,301 *et seq.*, (rev. ed. 1977), the author, in referring to this particular exception states:

> "The third exception to the term 'consumer report' covers the common situation in which a dealer or merchant attempts to obtain credit for his customer from an outside source (a finance company, for instance). The statute provides that the communication of the decision by the financial institution regarding the transaction is not a 'consumer report' *if* the retailer informs the customer of the name and address of the bank, finance company, or other financial institution to which the application or contract is offered *and* the bank, finance company, or other institution makes the disclosures required by Section 615 of the Act [*i.e.,* K.S.A. 50-714]." ¶ 11,306 E. 3.

The Federal Trade Commission has consistently held that lists containing the names of consumers who have had checks returned for insufficient funds are consumer reports. Besides the *Howard* case mentioned earlier, see also *Robert N. Barnes t/a National Credit Exchange, Etc.,* 85 F.T.C. 520 (1975); *Filmdex Chex System, Inc., et al.,* 85 F.T.C. 889 (1975); *Checkmate Inquiry Service, Inc., et al.,* 86 F.T.C. 681 (1975); *Interstate Check Systems, Inc.,* 88 F.T.C. 984 (1976); *Moore & Associates, Inc.,* 92 F.T.C. 440 (1978). The organizations compiling and publishing such lists have been issued cease and desist orders for violations of the Act, such as furnishing reports for impermissible purposes, failing to maintain procedures for settling disputed items, publishing noncoded lists, and publishing inaccurate reports.

Apparently the subscriber merchants were directed by TeleCheck to give information cards to those consumers whose checks were disapproved by TeleCheck. The card read:

> "Dear Customer:
> "We are sorry that we cannot accept your check at this time because TeleCheck will not approve it.
> "We encourage you to contact TeleCheck so they can explain the reasons for their actions and work with you to resolve the situation.
> "Please contact:
> Consumer Service Manager

(913) 381-8742
8 a.m. - 5 p.m. Monday - Friday
(913) 381-6963
after business hours
TeleCheck Kansas City
8650 West College Blvd., Suite 200
Overland Park, Ks. 66210"

Considering the aspects of TeleCheck's service, the decoded communication of information did bear upon a consumer's credit worthiness, credit standing and credit capacity. The information was collected for the purpose of establishing the consumer's eligibility for credit. Credit acceptance was primarily for check purchases of personal, family, or household goods. This falls within the definition of a "consumer report" set out in K.S.A. 50-702(c) when furnished to a merchant who has a legitimate business need for the information in connection with a business transaction involving the consumer.

Once it is determined the service offered is a consumer report within the definition of K.S.A. 50-702(c) it is then clear that TeleCheck is a consumer reporting agency within the definition appearing in K.S.A. 50-702(e). TeleCheck is a corporation who for monetary fees engages in whole or in part in the practice of assembling consumer credit information for the purpose of furnishing reports to third persons by means of interstate commerce. See 15 U.S.C.A. § 1681a (f) for the identical definition of a consumer reporting agency in the federal Act.

We hold the check guarantee and reporting service on bank checks of consumers, which defendant engages in for the benefit of merchant subscribers, falls within the definition of a "consumer report" as it appears in K.S.A. 50-702(c) and in 15 U.S.C.A. § 1681a (d), and defendant in furnishing such service is a "consumer reporting agency" as defined in K.S.A. 50-702(e) and in 15 U.S.C.A. § 1681a (f).

The FCRA requires a consumer reporting agency (1) to maintain procedures which will assure maximum possible accuracy, K.S.A. 50-706(b) and 15 U.S.C.A. § 1681e (b), (2) to maintain proper procedures to settle disputed accuracy of information, K.S.A. 50-710 and 15 U.S.C.A. § 1681i, and (3) to maintain proper procedures to assure that the information is furnished for permissible purposes, K.S.A. 50-706(a) and 15 U.S.C.A. § 1681e (a), 50-703 and § 1681b, and 50-714 and § 1681m. If defendant Tele-

Check did not do these things, it may be liable for damages in accordance with the provisions of K.S.A. 50-715 or 15 U.S.C.A. § 1681n, and K.S.A. 50-716 or 15 U.S.C.A. § 1681o. See *Bryant v. TRW, Inc.,* 487 F. Supp. 1234 (E.D. Mich. 1980).

Arguably Peasley's claim falls within K.S.A. 50-710 and 15 U.S.C.A. § 1681i which requires certain procedures to be followed in case of the disputed accuracy of an item of information on which a consumer report is based.

All cases agree there is a duty to maintain reasonable procedures to insure maximum possible accuracy. There is a duty to reinvestigate after the accuracy of a consumer credit file is disputed. *Middlebrooks v. Retail Credit Co.,* 416 F. Supp. 1013 (N.D. Ga. 1976); *Checkmate Inquiry Service, Inc., et al.,* 86 F.T.C. 681; *Hauser v. Equifax, Inc.,* 602 F.2d 811 (8th Cir. 1979).

Plaintiff's name was on the negative information list for over a year. It does not appear whether a reinvestigation was undertaken and neither does it appear whether plaintiff filed the statement of dispute as contemplated by K.S.A. 50-710 and 15 U.S.C.A. § 1681i. These are matters to be shown by evidence. At least arguably the bad check file on plaintiff was inaccurate because his name was on what was considered to be a bad check passers list and he had never written a bad check. The summary judgment was improperly entered for defendant. The defendant's check guarantee services did come within the provisions of the Fair Credit Reporting Act, and whether it violated the requirements of that Act depends on disputed facts which are material to the claim of the plaintiff.

The second issue raised on appeal concerns the holding by the district court that plaintiff could base no cause of action on the federal Fair Debt Collection Practices Act (FDCPA), 15 U.S.C.A. § 1692, *et seq.* (1981), because the acts of defendant which plaintiff claimed to be in violation of the FDCPA occurred before the effective date of this Act. Kansas has no counterpart to this federal Act.

The Acts complained of consisted of maintaining plaintiff's name on a computer bad check list long after defendant was advised that plaintiff had never written a bad check. This erroneous bad check listing resulted in having the merchants in the area refuse to accept plaintiff's bank checks. It is alleged the defendant threatened to continue this erroneous listing in order to force

collection of a disputed bill claimed by defendant to be due on a rental apartment occupied by plaintiff.

The FDCPA was enacted on September 20, 1977, and became effective upon the expiration of six months after September 20, 1977. Under 15 U.S.C.A. § 1692g (1981), in case of disputed debts as in this case, the Act applies only with respect to debts for which the initial attempt to collect occurred after the effective date. See § 818 of Pub. L. 90-312, set out as a note under § 1692 of this title. The effective date of the Act was, therefore, March 20, 1978. This law was enacted by Congress to eliminate false, deceptive, misleading, unfair, or harassing debt collection practices. *Rutyna v. Collection Accounts Terminal, Inc.*, 478 F. Supp. 980 (N.D. Ill. 1979). The initial collection letter was sent to the plaintiff on March 31, 1977, almost a year before the effective date of the Act. Therefore, summary judgment was properly entered in favor of defendant on the FDCPA claim.

The final issue concerns the entry of summary judgment on the common law claim for relief on wrongful debt collection practices. Plaintiff relies on the case of *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, Syl. ¶ 1, 529 P.2d 104 (1974), in which it is held:

"A creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm."

In the recent case of *Roberts v. Saylor*, 230 Kan. 289, Syl. ¶ 2, 637 P.2d 1175 (1981), it is held:

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it."

After examining the facts and circumstances of the present case, we hold that neither threshold requirement was shown to have been met and summary judgment in favor of defendant on this claim for wrongful debt collection practices was properly entered.

In summary we reverse the judgment in favor of defendant on plaintiff's claim based on the FCRA, K.S.A. 50-701 *et seq.,* and

remand for further proceedings; we affirm the judgment in favor of defendant on plaintiff's claims based on alleged violations of the FDCPA, 15 U.S.C.A. ¶ 1692 *et seq.* (1981), and on wrongful debt collection practices.