No. 54,448

RAYMOND HOARD and MARY S. HOARD, *Appellants*, v. SHAWNEE MISSION MEDICAL CENTER, a corporation, and OVERLAND PARK FAMILY MEDICAL PRACTICE, P.A., *Appellees*.

(662 P.2d 1214)

Opinion filed April 29, 1983.

*Keith Martin*, of Payne & Jones, Chartered, of Olathe, argued the cause and was on the brief for the appellants.

*Kenneth J. Reilly*, of Boddington & Brown, of Kansas City, argued the cause and was on the brief for the appellee Shawnee Mission Medical Center.

*Ronald C. Newman*, of Mustain & Newman, Chartered, of Kansas City, argued the cause and was on the brief for the appellee Overland Park Family Medical Practice, P.A.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal by Raymond and Mary S. Hoard (plaintiffs-appellants) from a summary judgment and directed verdict entered against them and in favor of Shawnee Mission Medical Center and Overland Park Family Medical Practice, P.A. (defendants-appellees). The issue presented is

whether under the controlling facts in this case the parents of a minor daughter can recover under theories of negligent infliction of emotional distress or the tort of outrage for emotional and physical damages alleged to have been sustained as a result of being told their daughter had died, when in fact she had not but was critically injured and in another hospital.

This lawsuit arises out of an unfortunate series of events which took place in the early morning hours of August 8, 1979. The facts are essentially undisputed. Around 10:30 p.m. on August 7, 1979, the plaintiffs' seventeen-year-old daughter Lisa, along with five other teenagers, was involved in a serious one-car accident in southern Johnson County. Both Lisa Hoard and the driver of the car, Kathleen Iveson, suffered massive head injuries. Lisa had no identification with her in the car. Three of the teenagers, including Lisa Hoard, were taken to Suburban Medical Center for treatment. Kathleen Iveson and two less seriously injured passengers were taken by ambulance to Shawnee Mission Medical Center.

The ambulance carrying Kathleen Iveson to Shawnee Mission Medical Center arrived at the emergency room of the hospital shortly after midnight on August 8, 1979. Miss Iveson had not yet been identified and was therefore originally admitted as "John Doe," which was soon thereafter changed to "Jane Doe" when it was determined the patient was female. The patient had been stripped of clothing in the course of emergency procedures performed prior to her arrival at the hospital and thus no clothing or other personal belongings accompanied the patient when she was admitted.

James Pike, an Olathe police officer, was present at the scene of the accident and subsequently went to Shawnee Mission Medical Center to determine the condition of the patients there and assist in identifying the unidentified patient. He arrived shortly after the ambulance carrying Miss Iveson. He talked to one of the teenagers involved in the accident and obtained the names of the six occupants in the car. About this time another officer at Suburban Medical Center also obtained the names of the six occupants from another passenger. He communicated these names along with the names of the three teenagers at Suburban Medical Center to a third officer at police headquarters, Chief Barnes. Among the three patients identified as

being at Suburban was Kathleen Iveson. During oral arguments counsel indicated that Lisa Hoard was mistakenly identified at Suburban as Kathleen Iveson because Miss Iveson's purse had been mistakenly sent with Miss Hoard to Suburban. By the process of elimination Officer Pike and Chief Barnes determined that the unidentified patient at Shawnee Mission Medical Center was Lisa Hoard. Officer Pike then informed the admitting clerk at Shawnee Mission that the name of the patient was Lisa Hoard.

Shortly thereafter a representative of Shawnee Mission Medical Center telephoned the appellants, informing them their daughter had been in an accident and they should come to the hospital. Upon their arrival they were told Lisa had suffered critical injuries and other close family members should be contacted. The Hoards asked if the hospital was sure the patient was Lisa and were told that positive identification had been made. Mrs. Hoard asked if there was any clothing, a purse or jewelry brought in with the patient that they could see to make sure it was Lisa. They were informed that no personal belongings had been brought in with the patient. They asked at various times if they could see Lisa, but were told it was not possible because of the severity of her condition and that it would interfere with the lifesaving procedures which were being performed. They were told they could see her after her condition stabilized.

For the next hour or so, the appellants and their family were kept informed on the critical condition of their daughter. At one point in time they were told by the hospital chaplain that they couldn't see Lisa because "as fast as they were pumping blood into her it was gushing out of her head." During this time Mary Hoard spoke with Officer Pike who had remained at the hospital. Officer Pike described the accident to Mrs. Hoard and indicated to her that Lisa was there at Shawnee Mission Medical Center receiving treatment. Sometime around 2:00 a.m. the appellants were informed their daughter had died. Mrs. Hoard became nauseated and had to be taken to the restroom and Mr. Hoard fell to his knees and began to sob. Medical records indicate the patient arrived at the hospital one hour and forty minutes prior to death, and during that time had been given seven units of blood.

The appellants were asked to select a funeral home and had to sign a form to release the body to the funeral home. As the Hoard

family was leaving the hospital, the appellants' son-in-law was asked to identify the body. He determined he could not be sure the patient was Lisa Hoard. A nurse ran out to the parking lot and told the appellants that there may have been a mistake concerning the identity of the patient. Mr. Hoard fainted and was caught by a priest accompanying them. The family returned to the hospital where Mrs. Hoard was asked to identify a necklace found on the patient. She said it did not belong to Lisa. (It was brought out in oral arguments that this necklace was concealed during treatment underneath a cervical collar which was placed on the patient at the accident and was apparently only discovered when the collar was removed after the patient's death. This was not brought out by the plaintiffs' evidence at trial, except for an attempt to show that the necklace would have shown up on a neck X-ray taken during treatment, inferring that the hospital should have been aware of it before the victim died.)

One of the appellants' sons was then asked to identify the patient and he determined it was not Lisa. About this time relatives of Kathleen Iveson arrived at the hospital and informed the Hoards that Lisa was at Suburban Medical Center.

The Hoards arrived at Suburban Medical Center around 3:30 a.m. and were told their daughter was in critical condition, having suffered severe head injuries. Throughout the night and the next several days the Hoards were informed that Lisa might die, but that if she survived she would not be the same. Lisa remained in intensive care in a coma for the next six weeks. During that time the Hoards were required to authorize life-saving operative procedures on several occasions. Mrs. Hoard stayed at the hospital continually throughout this time, going home only to eat an occasional meal with her family and do laundry, despite advice from her doctor to remain at home and get some rest. Mr. Hoard also spent a great deal of time at the hospital.

Lisa's condition slowly improved. Although she was able to return home, she required constant care and it was necessary for the appellants to hire nurses to assist with Lisa's care. Lisa underwent rehabilitative treatment in Kansas City and Denver, Colorado, and relearned to talk. Although confined to a wheelchair, she is also learning to walk again. It is undisputed that the fact of the accident itself and Lisa's resulting severe injuries, as

well as her extensive recovery, rehabilitation and continuing care, have been a tremendous emotional and physical stress on the appellants.

Both appellants suffered from various health problems prior to August 7, 1979. Mr. Hoard was diagnosed as having heart disease in 1950 when he was discharged from the service. In 1977 he was admitted to a hospital emergency room with chest pains which were diagnosed as angina. At the time of the accident he was overweight and had been advised by doctors that he should lose weight. Mrs. Hoard had suffered from nervousness throughout her adult life and at various times had been treated for depression, hypertension and esophagitis. From 1972 through 1979 she was on medication for her nervousness. Mrs. Hoard had also felt she might have a drinking problem and had joined Alcoholics Anonymous.

Following the accident the emotional health and stability of both appellants suffered. Mr. Hoard became severely distraught and depressed after the accident and had uncontrollable crying spells. He was hospitalized on October 6, 1979, suffering from severe depression and a nervous breakdown. He testified that he felt his emotional health was "extremely unstable and shattered" after the accident. His doctor testified that he felt the incident on August 8, 1979, at Shawnee Mission Medical Center caused Mr. Hoard to break down and become unable to cope with what was to follow concerning Lisa. Dr. Stanley Butts, a psychologist who evaluated the Hoards in preparation for trial, testified he felt Mr. Hoard could no longer handle a responsible position of employment.

Both appellants had nightmares associated with the incident at the hospital. Acquaintances testified the appellants constantly discussed the events at Shawnee Mission Medical Center in the months following the accident, oftentimes expressing their anger at being told Lisa was dead. Dr. Butts diagnosed both appellants as having "post-traumatic stress disorder." This is the term used to describe the patient who continues to reexperience a traumatic event, resulting in significant kinds of distress which include recurrent dreams, withdrawal from the outside world, sleep disturbances and difficulty in concentrating. In Dr. Butts' opinion, this condition was caused by the events on August 8, 1979, at Shawnee Mission Medical Center.

Also during this time the health of both appellants deteriorated. During his hospitalization in October 1979, Mr. Hoard was diagnosed as having an enlarged heart. In late 1980 and early 1981 the appellant began noticing several symptoms associated with his heart problem. In July 1981, Mr. Hoard was hospitalized for severe congestive heart failure and also underwent surgery for infarction of his intestines.

Mrs. Hoard was hospitalized for two days in September 1979, with reflux esophagitis, an inflammation of the esophagus. Her doctor testified that this condition was brought on by the emotional stress she was under at the time, the fact that she had increased smoking from one pack to three packs of cigarettes a day following the accident, and because she was not eating properly during this time. In September 1980, Mrs. Hoard was hospitalized for chest pains which occurred when she had to move Lisa or she was emotionally upset. She was diagnosed as having significant narrowing of two coronary arteries. The appellants' doctor testified that although they were under a great deal of stress at the time as a result of the accident and Lisa's condition, the incident at Shawnee Mission Medical Center on August 8, 1979, placed a severe amount of stress on the appellants which significantly contributed to their subsequent physical problems.

At the time of the accident Mr. Hoard was a full-time principal in the Shawnee Mission School District. After his hospitalization in October 1979, Mr. Hoard was given a leave of absence and another person was assigned to fill his position as principal. Mr. Hoard returned to work as an assistant principal at a different school in March 1980, and remained there until May 1981, at which time the position was eliminated due to personnel cutbacks. At that time he was not certain he wanted to continue as a principal and elected instead to take an early retirement at half his former salary. He testified at trial this was a financial decision and his intention was to get another job, perhaps in another school district or in business, to supplement his retirement income. Since that time he has made three unsuccessful applications for employment. In addition to his position with the school district, Mr. Hoard worked fifteen to twenty hours a week as a salesclerk at a hardware store from November 1979 until his hospitalization in July 1981.

The appellants brought this lawsuit against the appellees Shawnee Mission Medical Center and Overland Park Family Medical Practice, P.A., seeking damages for their emotional distress and the resulting deterioration in their health which they alleged were caused by the events at Shawnee Mission Medical Center on August 8, 1979, when they were mistakenly informed by the appellants that their daughter Lisa was dead. Overland Park Family Medical Practice, P.A., had contracted with Shawnee Mission Medical Center to operate its emergency department, and as a part of that contract it provided physicians to staff the emergency room. The contract provided:

"The designated physician shall assume full responsibility for the professional conduct of the Emergency Department including supervision and administration of the Department's professional activities. It also shall include discussions with and education of the Medical Center personnel in matters relating to the Emergency Department."

On the night of August 7, 1979, one of the designated physicians· on duty was Dr. Richard Williams, who treated Kathleen Iveson and communicated to the Hoards, during the early morning hours of August 8, that *the patient* had died.

The appellants assert they are entitled to damages under two theories of recovery: (1) for emotional and physical injuries caused by the hospital's negligence in misidentifying the patient as Lisa; and (2) for emotional distress caused by extreme and outrageous conduct. In addition to recovery for all medical expenses incurred since the incident the appellants sought recovery for loss of income, claiming that Mr. Hoard's emotional condition resulting from the incident required him to take an early retirement at half of his prior salary; reimbursement for additional help hired to care for Lisa, which the appellants contend was only necessary due to the emotional distress and physical disability they suffered from the incident; and punitive damages.

The trial court granted summary judgment in favor of the appellees on the appellants' cause of action for negligence holding that Kansas does not recognize a cause of action for negligent infliction of emotional distress. However, the court directed that the appellants' cause of action on the tort of outrage should proceed to trial. At the close of the appellants' case the trial court directed a verdict in favor of the appellees, finding that the

appellants had not presented any evidence that the appellees' conduct was extreme and outrageous, intentional or reckless. At the time the trial court ruled on the motion for summary judgment all discovery had been completed. The trial court had before it all pleadings, discovery documents and depositions taken in the case. The facts related above which were testified to at trial were essentially the same as those brought out in discovery. The appellants first challenge the trial court's dismissal of their cause of action for negligent infliction of emotional distress.

It has long been the general rule in Kansas that there can be no recovery for emotional distress suffered by the plaintiff which is caused by the negligence of the defendant unless it is accompanied by or results in physical injury to the plaintiff. *Hough v. Atchison, T. & S. F. Rly. Co.*, 133 Kan. 757, Syl. ¶ 4, 3 P.2d 499 (1931); *Clemm v. Atchison, T. & S. F. Rly. Co.*, 126 Kan. 181, 184, 268 Pac. 103 (1928); *Whitsel v. Watts*, 98 Kan. 508, 509, 159 Pac. 401 (1916); *Lonergan v. Small*, 81 Kan. 48, 50-51, 105 Pac. 27 (1909); *A. T. & S. F. Rld. Co. v. McGinnis*, 46 Kan. 109, 113, 26 Pac. 453 (1891). See also Prosser, Law of Torts § 54, at 328-29 (4th ed. 1971); 38 Am. Jur. 2d, Fright, Shock and Mental Disturbance § 1; Annot., 64 A.L.R.2d 100, §§ 7, 9, 11. This rule, however, does not apply where the injurious conduct is willful or wanton, or the defendant acts with intent to injure. *Lantz v. City of Lawrence*, 232 Kan. 492, 500, 657 P.2d 539 (1983); *Lonergan v. Small*, 81 Kan. at 51; 38 Am. Jur. 2d, Fright, Shock and Mental Disturbance §§ 4, 17; 64 A.L.R.2d 100, § 8. The reasons for the rule have been summarized by Prosser, Law of Torts § 54 at 329:

"The temporary emotion of fright, so far from serious that it does no physical harm, is so evanescent a thing, so easily counterfeited, and usually so trivial, that the courts have been quite unwilling to protect the plaintiff against mere negligence, where the elements of extreme outrage and moral blame which have had such weight in the case of the intentional tort are lacking."

A limited exception to the general rule has been recognized in Kansas and other states where a close relative suffers emotional harm from the negligent mishandling of a corpse. See *Alderman v. Ford*, 146 Kan. 698, 72 P.2d 981 (1937); *Hamilton v. Individual Mausoleum Co.*, 149 Kan. 216, 86 P.2d 501 (1939); Prosser, Law of Torts § 54 at 329-30, and cases cited therein; 64 A.L.R.2d 100, § 8. A minority of jurisdictions have also recognized an exception to the rule for emotional harm resulting from the

negligent transmission of a death message by a telegraph company. See *Kaufman v. Western Union Telegraph Company*, 224 F.2d 723 (5th Cir. 1955), *cert. denied* 350 U.S. 947 (1956); Prosser, Law of Torts § 54 at 329 and cases cited therein; 64 A.L.R.2d 100, § 11. In a similar type of case the daughter of a long-time hospital patient was allowed to recover for emotional harm resulting from negligent information given to her by the hospital that her mother had died. *Johnson v. State of New York*, 37 N.Y.2d 378, 372 N.Y.S.2d 638, 334 N.E.2d 590 (1975). Liability was based on the hospital's duty to advise the proper next of kin of the death of a patient. The case is distinguishable from the situation presented here in that the hospital in *Johnson* had the correct information available to it at all times and committed the error by violating its own procedures and carelessly pulling the wrong patient record. This is the only case disclosed by our research concerning the liability of a hospital or similar institution for giving erroneous notification of a patient's death. See Annot., 77 A.L.R.3d 501. In Kansas recovery has been denied for mental distress alone resulting from the negligent failure to deliver a message announcing the death of a close relative. See *Ramey v. Telegraph Co.*, 94 Kan. 196, 146 Pac. 421 (1915); *Cole v. Gray*, 70 Kan. 705, 79 Pac. 654 (1905); *West v. Telegraph Co.*, 39 Kan. 93, 17 Pac. 807 (1888).

The appellants contend that they have suffered physical injuries as a result of the emotional distress caused from being told their daughter had died, and therefore are entitled to maintain an action against the appellees for the negligent infliction of emotional distress. In the alternative they argue that if their physical injuries were not sufficient to permit recovery under the general rule, they should be permitted to recover for emotional distress in the absence of physical injury under one of the exceptions to the rule. The appellees contend the physical injuries suffered by the appellants were too remote in time from the incident and too speculative to permit recovery.

In our cases which have allowed recovery for physical injury resulting from emotional harm caused by the defendant's negligence, the physical injury complained of occurred contemporaneously with or shortly after the incident causing the emotional distress. In *Clemm v. Atchison, T. & S. F. Rly. Co.*, 126 Kan. at 181, recovery was allowed where the physical injury

suffered was "substantially simultaneous" with the emotional distress caused by the defendant's conduct. In that case the defendant railroad failed to transport the plaintiff's deceased husband's body to the proper location, and upon being informed the body had not arrived as anticipated, the plaintiff fainted and collapsed, which resulted in physical injuries. The court held:

"Here the fright, terror, grief, shock, and the fall with resulting physical injuries were substantially simultaneous, and by the allegations of the petition all of them resulted naturally and directly from the negligence of plaintiff. To say that the mental anguish preceded the physical injuries by a second or two, and therefore that there is no liability for either, is to make too much of a refinement for practical purposes, and one that would tend to defeat justice rather than to promote it." 126 Kan. at 187.

See also 64 A.L.R.2d 100, § 6.

In *Whitsel v. Watts*, 98 Kan. 508, after being frightened by angry threats made by the defendant, the plaintiff ran into her house and collapsed. A few hours after gaining consciousness she suffered a miscarriage with subsequent illness. The court allowed the plaintiff to recover for her injuries which directly resulted from the fright caused by the defendant's intentional conduct.

In *Cernes v. Pittsburg Coca Cola Bottling Co.*, 183 Kan. 758, 332 P.2d 258 (1958), the plaintiff was allowed to recover for intense nausea directly resulting from emotional and psychological distress suffered when he swallowed part of a slimy substance while drinking a bottle of Coca Cola. A similar holding was reached in *Connell v. Norton Coca-Cola Bottling Co.*, 187 Kan. 393, 357 P.2d 804 (1960), when the plaintiff suffered physical and emotional damages after discovering a decomposed centipede in a bottle of Coca Cola from which he was drinking.

The appellants maintain they suffered physical injury at the time they were told of Lisa's death when Mr. Hoard collapsed and Mrs. Hoard became nauseated and vomited. Mr. Hoard also fainted upon being told a mistake may have been made. However, no evidence was presented concerning the nature or amount of injury from these events. Furthermore, these are not the injuries for which the appellants seek recovery. The injuries for which damages are sought for the hospital's negligence occurred much later in time. Mr. Hoard first seeks recovery for his hospitalization for severe depression and a nervous breakdown in October 1979, *two months* after the incident at Shawnee

Mission Medical Center. He also seeks recovery for health problems suffered in 1980 and 1981, resulting in his hospitalization in July 1981, almost *two years* after the incident. Mrs. Hoard seeks recovery for her hospitalization for esophagitis *six weeks* after the incident and her hospitalization for chest pains *one year* later. As a result of their physical and emotional problems the appellants contend Mr. Hoard was forced to quit his job, resulting in loss of income, and that they were required to hire additional help to care for Lisa, thus incurring additional expense.

The physical injuries suffered by the appellants occurred a substantial length of time, from six weeks to two years, after the incident. As in all actions for the recovery of damages for negligence, the appellants must show that the physical injuries complained of were the direct and proximate result of the emotional distress caused by the hospital's alleged negligent conduct. *Whitsel v. Watts*, 98 Kan. at 510; *Clemm v. Atchison, T. & S. F. Rly. Co.*, 126 Kan. at 187; 38 Am. Jur. 2d, Fright, Shock and Mental Disturbance § 23; Annot., 64 A.L.R.2d 100, §§ 5, 9(c). Furthermore, it is a fundamental principle of law that recovery may be had only where it is shown with reasonable certainty that damage was suffered and that such damage resulted from the act or omission of which complaint is made. *Apperson v. Security State Bank*, 215 Kan. 724, 735-36, 528 P.2d 1211 (1974). Recovery may not be had where the cause of the injury is too remote and speculative and where the alleged resulting damages are too conjectural and speculative to form a sound basis for measurement. *Buck v. Miller Amusement Co.*, 166 Kan. 205, 209, 200 P.2d 286 (1948). Other states have held that where a plaintiff seeks recovery for emotional disturbance and physical injury resulting therefrom the plaintiff must show that the physical injury was the natural result of fright or shock proximately caused by the defendant's negligence, and recovery may be had if, but only if, there is shown a clear and unbroken chain of causal connection between the negligent act, the emotional disturbance and the physical injury. See *Hughes v. Moore*, 214 Va. 27, 35, 197 S.E.2d 214 (1973); 38 Am. Jur. 2d, Fright, Shock and Mental Disturbance § 23; Annot. 64 A.L.R.2d 100, § 9(c).

It cannot be disputed that the appellants suffered a tremendous amount of emotional and physical stress and anxiety as a

result of the severe condition of their daughter and her subsequent rehabilitation. Despite this the appellants maintain that all of the emotional and physical maladies suffered by them, since the time of their daughter's accident, have been caused solely by the emotional distress while at the Shawnee Mission Medical Center on August 8, 1979, when they were informed that Lisa had died, and in no way relate to the stress they have undergone as a result of the accident itself and Lisa's condition. This claim is not supported by the appellants' evidence. The appellants' doctor testified that the stress experienced by them during the events at Shawnee Mission Medical Center "significantly contributed" to the overall amount of stress they were under as a result of Lisa's condition, which had a definite relationship to their illnesses and the deterioration of their health. Specifically, he testified that the incident caused Mr. Hoard to "break down" so that he could no longer deal with stress and Lisa's condition, which later caused him to neglect his own health. No evidence was presented that his subsequent heart problems in late 1980 and 1981 and intestinal surgery in 1981 resulted from the incident in 1979. Concerning Mrs. Hoard he testified that the stress she suffered from the incident contributed to her esophagitis because it increased the overall amount of stress she was under, causing her to smoke more and maintain an improper diet. The only evidence presented relating her subsequent diagnosis of narrowing of her coronary arteries to the incident is that it is a condition which is contributed to by cholesterol buildup which can be related to stress.

Concerning the appellants' claim for loss of income, however, there is absolutely no evidence in the record that Mr. Hoard's retirement was necessitated by his physical or emotional health. He worked at full salary in a position similar to the one he had occupied for several years until May 1981 when the position was eliminated. When no similar position was available for him to fill at the time, he elected to retire at half-salary and obtain another full-time position elsewhere, rather than take a teaching position at a much lower salary. This decision was clearly precipitated by financial, rather than health, concerns. Similarly, no evidence was presented by the appellants showing that due to their emotional and physical conditions it was necessary to hire nurses to care for Lisa, which ordinarily would not have been required.

The physical problems suffered by the appellants are so remote in time from the events at Shawnee Mission Medical Center that they form no basis for recovery under the theory of negligent infliction of emotional distress. Case law requires that the physical injuries must *directly* result from the emotional distress allegedly caused by the defendant's negligence, and must appear within a short span of time after the emotional disturbance. Although the appellants' doctor testified that these events "contributed" to the appellants' physical illnesses, there is no evidence they are the direct, proximate, sole or even major cause of the appellants' problems. The stress and anxiety suffered by the Hoards as a result of Lisa's condition in the weeks and months following the accident overwhelmingly appear to be the major, if not sole, cause of the illnesses. The alleged resulting damages are simply too conjectural, speculative, and remote in time from the incident to form a sound basis for measurement, and therefore no recovery can be allowed upon the basis of negligent infliction of emotional distress.

The foregoing issue presented a question of law for the trial court and therefore a motion for summary judgment was properly sustained. *Farmers State Bank & Trust Co. of Hays v. City of Yates Center*, 229 Kan. 330, Syl. ¶ 7, 624 P.2d 971 (1981). In ruling on the motion for summary judgment, however, the trial court was incorrect in its unqualified statement that Kansas does not recognize the tort of negligent infliction of emotional distress. The cause of action can be maintained where emotional distress is accompanied by or results in immediate physical injuries. The facts alleged by the appellants in their pleadings did not state a cause of action because it was not shown that the appellants suffered any immediate physical injury which was a direct and proximate result of the emotional distress caused by the alleged negligence.

The appellants next claim the trial court erred in directing a verdict against them on their action for outrage. In *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 820, 529 P.2d 104 (1974), this court recognized the tort of outrage and adopted the test set forth in the Restatement (Second) of Torts § 46(1) (1963):

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such

emotional distress, and if bodily harm to the other results from it, for such bodily harm."

In *Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175 (1981), we discussed the elements which must be shown to establish a cause of action for outrage: (1) the conduct of the defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

The trial court ruled the evidence presented by the appellants did not show that the appellees' actions were intentional or in reckless disregard of the appellants, or that the conduct was extreme or outrageous. In reviewing a directed verdict the court will resolve all facts and inferences in favor of the party against whom the ruling is sought and if the evidence is such that reasonable minds could reach different conclusions thereon, the motion should be denied. *Lemley v. Penner*, 230 Kan. 25, 27, 630 P.2d 1086 (1981).

It is clear from the evidence that the identification of the patient as Lisa Hoard was not intentional. We must therefore first consider whether the hospital's conduct was in reckless disregard of the appellants. What constitutes "reckless" conduct to establish a cause of action for outrage was discussed at length in *Wiehe v. Kukal*, 225 Kan. 478, 483-84, 592 P.2d 860 (1979). The court quoted the following discussion from the Restatement (Second) of Torts § 500 comment a (1963):

"**Types of reckless conduct.** Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

"For either type of reckless conduct, the actor must know, or have reason to know, the facts which create the risk. . . .

"For either type of conduct, to be reckless it must be unreasonable; but to be reckless, it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible

danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence."

After reviewing other definitions of reckless the court concluded:

"Thus we see that recklessness requires knowledge. The person who is reckless must have prior knowledge; he must know or have reason to know of facts which create a high degree of risk of harm to another, and then, indifferent to what harm may result, proceed to act." 225 Kan. at 484.

See also *Blackburn v. Colvin*, 191 Kan. 239, 246, 380 P.2d 432 (1963); *State v. Custer*, 129 Kan. 381, 395, 282 Pac. 1071 (1929). In *Wiehe* the plaintiff brought an action for emotional distress she suffered from witnessing an angry confrontation between a neighbor and her husband in which the neighbor threatened her husband with a pitchfork in the course of ranting, raving, cursing and shouting at her husband. The court held this did not constitute reckless conduct because the average person would not have expected a bystander to suffer such emotional injury.

Did the hospital's actions in this case constitute reckless conduct? Relying upon the testimony of their expert witness, Dr. Bennie Scott, the appellants contend the hospital was reckless in notifying the Hoards of the serious injury and subsequent death of their daughter when there was no basis for identification of the patient as Lisa Hoard. Dr. Scott testified that in his opinion information provided by a police officer concerning the identity of a patient did not constitute positive identification of a patient unless corroborated by other evidence; information regarding the source or basis of the identification should be obtained before the family is notified and informed of the deteriorating condition of the patient. He further testified that where tentative identification has been made the hospital should inform the family of this fact only and request that they come to the hospital and make a positive identification before any further information concerning the patient is released. On cross-examination Dr. Scott explained that his opinion was based on operational guidelines used by hospitals where he has worked. He also admitted he did not know upon what basis the police officers in this case identified Lisa Hoard.

The evidence discloses there are no nationally published standards for procedures to be used in identifying patients. Janice Marr, the hospital's Emergency and Outpatient Depart-

ment Manager, testified that it is standard practice to rely on information concerning the identity of a patient supplied by a police officer who was at the scene of the accident. The hospital was not informed of how the identification was made, nor that there was any reason to doubt the information supplied by Officer Pike that the patient was Lisa Hoard. Had the hospital made an inquiry into the basis of the identification, as recommended by Dr. Scott, they would have been informed of the same facts upon which Officer Pike and Chief Barnes made the identification, and like the police officer, they would have had no reason to suspect that the information was not correct.

In short, the hospital had no knowledge of the actual circumstances, nor that its conduct could result in such extreme harm to the appellants. The hospital did not proceed to act in total disregard of the knowledge that its information was or could be wrong. Janice Marr testified it is a primary concern of the hospital to notify the family of a critically injured trauma patient as soon as possible. It is difficult to say that the hospital was negligent, much less reckless, in contacting the Hoards under the circumstances and informing them that Lisa had been critically injured. Conversely, if in fact the patient had been Lisa, it may have been negligent conduct for the hospital to fail to contact the Hoards until well after death had occurred: refusing to rely on the information supplied by the police officer and instead insisting on corroboration to establish "positive identification" may have subjected the hospital to a charge of negligence.

The fact the appellants were not given an opportunity to see the patient until after they were notified of the death and that they were repeatedly told that positive identification had been made also does not render the conduct reckless. There is no evidence to suggest the hospital was aware of the error until the appellants' son-in-law tried to identify the body. Likewise the evidence indicates the hospital was unaware of the necklace worn by the patient until after the patient had died and the family informed. The family was not permitted to see the patient because it would interfere with lifesaving procedures being performed. The plaintiff's expert, Dr. Scott, testified that under such circumstances identification of the patient by family members should not be permitted until after the patient's condition

has been stabilized. Unfortunately, this opportunity never arose.

It is also necessary to determine whether the appellees' conduct was extreme and outrageous. In prior cases this court has recognized that to meet this requirement the conduct must be so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. Further, liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead the citizen to spontaneously exclaim, "Outrageous!" *Roberts v. Saylor,* 230 Kan. at 293; *Dotson v. McLaughlin,* 216 Kan. 201, 210, 531 P.2d 1 (1975); Restatement (Second) of Torts § 46 comment d.

Numerous cases involving the tort of outrage have come before this court and the Court of Appeals since our decision in *Dawson;* however, in only one other case has the conduct been held to be extreme and outrageous. In *Dawson* we held that harassment by a creditor knowing the debtor was ill and which worsened the debtor's condition was sufficient to constitute a cause of action for outrage. In *Gomez v. Hug,* 7 Kan. App. 2d 603, 645 P.2d 916, *rev. denied* 231 Kan. 800 (1982), the Court of Appeals held that unprovoked racial insults and threats made by an employer, which caused the employee to be fearful for his job and family, was sufficient evidence of extreme and outrageous conduct for the action to be submitted to a jury.

In other cases, however, the conduct complained of has fallen short of the extreme conduct contemplated by the Restatement. In *Roberts v. Saylor,* a doctor expressing his dislike for a patient being prepared for surgery, with whom he had had previous unpleasant encounters, did not go beyond the bounds of decency to be sufficiently outrageous. In *Wiehe v. Kukal,* 225 Kan. at 478, the defendant's conduct was not considered extreme and outrageous where he threatened the plaintiff's husband with a pitchfork during a fenceline dispute. Recently in *Hanrahan v. Horn,* 232 Kan. 531, 657 P.2d 561 (1983), we held that statements made by the defendant to a real estate class that the plaintiff was a suspect in the disappearance and murder of his son would not support an action of outrage. In *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 563 P.2d 511 (1977), racial slurs and other insults directed at the plaintiff during a private encounter were held not

to be outrageous. See also *Dotson v. McLaughlin,* 216 Kan. 201; *Young v. Hecht,* 3 Kan. App. 2d 510, 597 P.2d 682, *rev. denied* 226 Kan. 793 (1979); *Vespa v. Safety Fed. Savings & Loan Ass'n,* 219 Kan. 578, 549 P.2d 878 (1976); *Peasley v. TeleCheck of Kansas, Inc.,* 6 Kan. App. 2d 990, 637 P.2d 437 (1981).

In line with the foregoing cases, the action of the hospital on the evidence in this case in informing the plaintiffs that their critically injured daughter was being treated at the hospital and that she subsequently died did not constitute extreme and outrageous conduct. The acts of the hospital consist of good-faith reliance on information provided by a police officer which was considered to be reliable, and notifying the family of a critically injured patient in accord with the hospital's standard practice. A situation factually similar to the instant case was involved in *Peddycoart v. City of Birmingham,* 392 So. 2d 536 (Ala. 1980). The plaintiffs were told by a police officer that their son had attempted suicide in jail and upon their arrival at the hospital they were told the boy had died. After viewing the body the plaintiffs determined it was not their son. The court rejected the plaintiffs' claim that the police officer's conduct in wrongfully identifying the boy was extreme and outrageous conduct, holding:

"Nothing is contained in the evidence to suggest that the police sergeant whose conduct precipitated the emotional responses did anything but commit a mistake. That is, there is no evidence that he intentionally or recklessly caused the distress which ensued." 392 So. 2d at 540.

In *Wood v. United Air Lines, Inc.,* 404 F.2d 162 (10th Cir. 1968), the court held that the defendant airline's erroneous statements to the plaintiff that his wife was not a passenger on an airplane which had crashed, when in fact she had been on the airplane and had been killed, did not amount to outrageous conduct.

In this case, the hospital merely relayed information considered reliable to those thought to be the family of a critically injured patient. The mistake of misidentifying the patient as Lisa Hoard was not made by employees of the hospital. The hospital's conduct certainly was not tantamount to malice and it cannot be said that reliance by hospitals on information concerning identity of critically injured patients supplied by police officers is utterly intolerable in a civilized society. To hold that a hospital

could not rely in good faith on information provided by a police officer who was present at the scene of the accident would create a seemingly impossible burden on hospitals in identifying accident victims.

The actions of Dr. Williams, an employee of Overland Park Family Medical Practice, P.A., were even less culpable. He merely assumed the responsibility of informing those people thought to be the family of the patient of the patient's death. There is no evidence to show that he was responsible in any way for identifying the patient. He only relied on what he had been told by hospital personnel. The conduct of these defendants does not amount to such extreme and outrageous conduct as to constitute a cause of action for outrage.

Finally the appellants argue that putting aside all legal theory, rules and technicalities it must be remembered that they have suffered severe emotional damage from the events of August 8, 1979, at Shawnee Mission Medical Center, and they should be allowed to recover for these damages. Being told that a child has died is undoubtedly a tragic and traumatic experience for any parent, even though it may later be discovered that the information received was false. Without doubt the appellants here suffered shock, grief and emotional distress at being told their daughter had died and later were confused, angry and distressed upon being told a mistake had been made. Nevertheless, as we recently discussed in *Schmeck v. City of Shawnee*, 231 Kan. 588, 590, 647 P.2d 1263 (1982), damages do not create a right or cause of action. The "cause of action" is the wrong done, not the measure of compensation for it, or the character of relief sought. Damages are merely a part of the remedy which the law allows for the injury resulting from a breach or wrong. See also *Foster v. Humburg*, 180 Kan. 64, 67-68, 299 P.2d 46 (1956).

The judgment of the lower court is affirmed.