No. 38,320

S. S. Alexander, *Appellant,* v. Wilfred Wehkamp and Alvin Wehkamp, *Appellees.*

(232 P. 2d 440)

Opinion filed June 9, 1951. ▮

*A. M. Fleming,* of Garden City, argued the cause, and *S. S. Alexander,* pro se, of Kingman, and *Clark H. McPherson,* of Garden City, were with him on the briefs for the appellant.

*Charles H. Stewart,* of Kingman, argued the cause, and *Paul R. Wunsch,* of Kingman, *Logan N. Green, Roland H. Tate,* and *Daniel R. Hopkins,* all of Garden City, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Wertz, J.: Appellant (plaintiff below) as landowner brought this action against the appellees (defendants) as tenants under a written lease.

Plaintiff's first cause of action was to replevin the entire volunteer wheat crop raised and harvested on 88.43 acres of the leased land. His second cause of action was to recover damages against defendants for their failure to drill and plant 212 acres of wheat which with the 210 acres drilled would make up the ⅔ of the section required, under terms of the written lease, to be drilled to wheat.

Defendants answered claiming ⅔ of the volunteer wheat crop raised and harvested on the 88.43 acres; the answer alleging that the written lease had been modified by an oral agreement of December 11, 1947, to permit the volunteer wheat on 182 acres in the south ½ of the section to stand and mature and be treated as drilled wheat. In their cross petition, defendants claimed damages against plaintiff for plowing up 94 acres of this 182 acres of volunteer wheat referred to above in which defendants claimed a ⅔ interest.

Plaintiff's amended reply denied making any oral agreement which modified the terms of the written lease.

The pertinent facts may be stated as follows: On December 4, 1946, plaintiff-lessor leased to defendants a short section of land consisting of 633 acres in Finney county for a term of one year commencing on August 1, 1947, and ending July 31, 1948. The lease consists of a printed form containing nine separate printed provisions having nine typewritten provisions on the back and having attached thereto numerous additional provisions; due to the length of the lease it will not be set out, but pertinent provisions thereof will be referred to.

Under the terms of the written lease, at least ⅔ (422 acres) of the entire acreage of the section was to be well cultivated to make a good seed bed and planted to wheat in the fall of 1947. The remaining ⅓ (211 acres) of the section was to be summer fallowed in the fall and in the spring and left rough to prevent blowing and to catch and preserve the moisture.

Defendants went into possession of the land and worked what they thought was ⅔ of the land which was to be drilled to wheat under the terms of the lease. This consisted of the north ⅓ and the south ⅓ of the section leaving the center ⅓ for summer fallow. Later and after the first moisture of the fall season, defendants started to drill wheat on the ground that had once been worked. They had drilled the north ⅓ of the section (210 acres), and had started on the south ⅓, having drilled approximately nineteen acres thereof, when the weather became bad and as a result further drilling was impossible. There was at this time, in the latter part of November or fore part of December, 1947, a good stand of volunteer wheat growing on this south ⅓ of the section. On December 11, 1947, defendant Alvin Wehkamp went to the office of plaintiff in Kingman, Kansas, and told plaintiff that their drills and machinery were still in the field and the seed wheat in the granary. Said defendant testified to the following conversation with the plaintiff on December 11 with reference to modifying the terms of the written lease:

"A. Well, as near as I can remember, I told Mr. Alexander our drills were still in the field, and tractor, and my truck was in the granary, and the volunteer was coming up, and I didn't think it would be a good idea to sow that and kill that volunteer, as late as it was, because it was a good stand and thought it would be good to leave it standing for a crop, and he agreed on that.

"Q. Just tell the conversation, as near as you can remember.

"A. He said he guessed it would have to be all right; he didn't like it; I said I didn't like it either, but as late as it was it looked like the only thing we could do if we wanted to raise a crop of wheat.

"Q. Did you tell him you weren't going to drill the rest of that". . . .

"A. No, I didn't tell Mr. Alexander I wasn't, until he said it would be all right. I wouldn't have to, and I just decided that; I didn't say, as I remember, that I absolutely wouldn't, or wasn't."

The north ⅓ of this section is not in question in this case, that 210 acres of drilled wheat having been harvested and properly divided between the parties. The center ⅓ of the section, approximately 212 acres, which the plaintiff claims should have been planted to wheat as alleged in his second cause of action, was never worked and defendants claim that was the portion (⅓ of the section) left for summer fallow under the terms of the lease; that they had the right to determine the part of the section to be summer fallowed; that the section was not worked because of the extreme dry weather; and there were not sufficient weeds to require that ground to be worked; and for the foregoing reasons they were not liable to plaintiff in any sum on his second cause of action.

There seems to be no dispute but that the center ⅓ of the section was to be left for summer fallow. Plaintiff testified that in speaking of the summer fallowed land he referred to the center piece, and late in the fall advised defendants by letter that inasmuch as that ground had not been worked or summer fallowed, they should not at that late date do so until further authorization from him. No such authorization appears in the record.

Plaintiff testified:

"Q. Now referring back to your letter of August 4th, or—your letter of September 27, you say 'on talking to Alvin [defendant], he advised that the ground that you didn't expect to put to wheat was not summer fallowed'. What ground were you referring to there?

"A. The ground that he said hadn't been plowed at all.

"Q. You didn't expect that to be put into wheat in the fall by the Wehkamps, did you?

"A. I didn't know; I knew they had agreed to put in two-thirds under the lease; I had no control over what part they put in.

"Q. You understood at that time that was the part they were not going to sow?

"A. That is what he said he wasn't going to.

"Q. And you made no objection to that at the time?

"A. I did on August 4th . . . [by] that letter of August 4th.

"Q. You mean in this letter you made some objection to them leaving this middle part as summer-fallowed ground?

"A. I said it should all be plowed.

"Q. But that still didn't mean that that was not going to be left for summer fallow.

"A. That was up to them; I had no control over what they put in, as long as they put in two-thirds. Nothing in the lease says that I have anything to say about what they drill, or don't drill."

This brings us to the question involved in this law suit; that is, right to the crop raised on the south ⅔ of the section consisting of approximately 201 acres. Nineteen acres of this ⅔ was drilled to wheat and harvested along with the north ⅓ of the section, and is not in question here, leaving approximately 182 acres of volunteer wheat on land which, under the terms of the lease should have been plowed and planted, but as hereinbefore alleged, the condition of the weather and the lateness of the season made planting it practically impossible. As a consequence, defendants allege that on December 11th they contacted the plaintiff at Kingman in regard to modifying the written lease by permitting the volunteer wheat, which was looking good, to stand and be treated as drilled wheat, and that plaintiff orally agreed thereto.

Judgment was rendered in favor of the defendants for possession of ⅔ of the volunteer wheat crop raised on the 88.43 acres and for $1130 on their cross petition for damages for ⅔ of the value of the volunteer wheat on the 94 acres plowed up by plaintiff without defendants' consent. From this judgment plaintiff appeals and assigns numerous specifications of error.

Plaintiff complains that the court committed error in overruling his motion for judgment at the close of defendants' evidence and plaintiff's demurrer thereto, and claims there is no evidence to show any valid oral contract changing the terms of the written lease. As heretofore related, on December 11, 1947, defendants contacted plaintiff in his office at Kingman and there related the facts to the plaintiff that it was too late to plant the south ⅔ of the section and it was impossible to prepare the ground for such planting; that the volunteer wheat growing on that part of the section was good and if left standing would produce a crop; that the plaintiff agreed with defendants that owing to the late date it would be better to let the volunteer wheat stand. This conversation is not denied by the plaintiff and a careful examination of the record discloses that if anything, the plaintiff consented thereto. Plaintiff testified that on December 11, 1947, defendant Alvin Wehkamp came to his office in Kingman and that a conversation took place with reference to the planting of the south ⅔ of the section. The substance of the

conversation is hereinbefore set forth. Plaintiff was questioned with reference to the conversation and he testified that if he answered defendant at all, he agreed with him, but he didn't remember giving him an answer.

There was ample evidence to justify the trial court in overruling plaintiff's motion for judgment and demurrer to the evidence. The matter was submitted to the jury which by its general verdict found all issues in favor of defendants, including a finding that the written lease was modified by an oral agreement on December 11, 1947.

Inasmuch as the general verdict carried the finding that the written lease was modified by the oral agreement, plaintiff's first and second causes of action must fail because they are based on the written lease.

This brings us to the question of the specification of error raised by the plaintiff that the court erred in its instructions to the jury. Plaintiff's main contention is that the court failed to properly instruct the jury on the burden of proof, and he contends that the court should have instructed the jury that it was incumbent upon the defendants to prove their cause of action on an oral modification of the lease by clear and convincing evidence.

An examination of instructions 3 and 5 given by the court discloses that plaintiff's request had been substantially complied with. The court stated in instruction 3 among other things that "you are further instructed that the burden of proof in this case shifts to the defendants, to prove to your *satisfaction* by a preponderance of the evidence, every allegation of their answer and cross-petition to establish the existence of the oral contract and agreement claimed by them." Pertinent parts of instruction 5 read as follows: "By a 'preponderance of the evidence' is not meant merely the greater number of witnesses upon the side of the other, but is that evidence which is most *convincing* and *satisfying* to the jury." (Italics supplied.)

Appellant contends that a higher degree of evidence, clear and convincing rather than a preponderance, is necessary to show an oral modification of a written contract. Where a written contract in evidence is an admitted fact, and the issue is to an alleged oral modification thereof, an instruction that the written agreement is the best evidence, unless the oral modification is established by a preponderance of the evidence satisfactory to the minds of the

jurors, is not erroneous as an instruction that the written contract is entitled to greater weight than other evidence. Where there is a dispute as to the intention of the parties to a written contract, and a question of its subsequent modification by oral agreement, the interpretation of the written contract in connection with the oral contract is for the jury. (*Carstens v. Earles,* 26 Wash. 676, 67 Pac. 404; 13 C. J. 779.) Evidence to show a parol modification of a written contract must be clear and convincing, but it need not be uncontroverted. A preponderance of the evidence will suffice. (13 C. J. 779; 17 C. J. S. 1260.)

Other specifications complaining of error in the court's instructions have been examined and found without merit. From an examination of the instructions given, as a whole, and the entire record, we are convinced the jury was fairly apprised of the issues involved, and the failure on the part of the court to give plaintiff's requested instructions did not prejudicially affect his substantial rights.

Plaintiff asserts error in the court's refusal to·submit to the jury certain special questions requested by him. At the outset it may be stated that it is not error to refuse to submit to the jury questions which would not if answered elicit any fact that could affect the judgment to be rendered. (*Campbell v. Reno County,* 103 Kan. 329, 175 Pac. 155.)

We have carefully examined the special questions requested by plaintiff and inasmuch as the oral conversation had between the parties on December 11, 1947, with reference to modifying the original lease, is not disputed by plaintiff, answers to the questions, had they been submitted, could have had no effect on the judgment rendered. The question of consideration for the oral modification of the lease was a matter of law to be decided by the court. It has been held that there is sufficient consideration for a promise if there is any benefit to the promisor or any loss or detriment to the promisee. Faced at the late date of December 11th with the uncertainty of any crop from wheat which might thereafter be planted in accordance with terms of the existing lease, plaintiff agreed to the modification which gave him an assured crop from the good stand of volunteer wheat already growing on the land. Surely the benefit to promisor from such a modification cannot be seriously questioned.

The trial court has a wide discretion as to the special questions to be submitted to the jury, and where it appears that a question is not intended to bring out some ultimate fact in the case, it is proper to refuse to submit it. (*Sluss v. Brown-Crummer Inv. Co.,* 143 Kan. 14, 53 P. 2d 900.) Moreover, it is not reversible error to refuse to submit to a jury a special question where the answer to the question, by itself or in connection with another question submitted, could not have been contradictory to the general verdict or could not have compelled a different judgment. (*Abell v. Railway Co.,* 115 Kan. 132, 222 Pac. 91.) We find no error requiring a reversal of the judgment by reason of the lower court's refusal to submit to the jury the special questions requested by plaintiff.

Other specifications of error are asserted by plaintiff, all of which have been considered. However, in view of the entire record, instructions given by the court, the general verdict rendered by the jury, and the judgment of the court, those alleged errors are at most technical and do not affirmatively appear to have prejudicially affected the substantial rights of the plaintiff. In this jurisdiction, technical errors which do not affirmatively appear to have prejudicially affected the substantial rights of parties are not grounds for reversal of a judgment (G. S. 1949, 60-3317 and cases cited thereunder; *Stevens v. Jones,* 168 Kan. 583, 215 P. 2d 653; Hatcher's Kansas Digest, Appeal and Error, §§ 509, 592; West's Kansas Digest, Appeal and Error, §§ 1026, 1034).

No error having been made to affirmatively appear, the judgment of the lower court is affirmed.