No. 55,025

W-V Enterprises, Inc. and E. Michael Wayland, *Appellees,* v. Federal Savings & Loan Ins. Corp., as Receiver for North Kansas Savings Association, *Appellant.*

(673 P.2d 1112)

Opinion filed December 2, 1983.

W. *Dennis Cross,* of Morrison, Hecker, Curtis, Kuder & Parrish, of Kansas City, Missouri, argued the cause and *Martin J. Purcell, P. John Owen,* and *John J. Benge,* of the same firm, were with him on the briefs for the appellant.

*Thomas P. Vartanian, Ralph W. Christy, Harvey Simon,* and *Dorothy L. Nichols,* of the Office of the General Counsel, Federal Home Loan Bank Board, of Washington, D.C., and *Milo M. Unruh, Sr.,* of Arn, Mullins, Unruh, Kuhn & Wilson, of Wichita, were attorneys of counsel for the appellant.

*Charles D. McAtee,* of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause and *Anne L. Baker,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

HERD, J.: The plaintiffs-appellees are Michael Wayland and W-V Enterprises, Inc. The defendant at trial was North Kansas Savings Association, a federally insured, state chartered savings and loan corporation. By virtue of a post-trial order of the Federal Home Loan Bank Board the defendant is in receivership, and the appellant is now the Federal Savings & Loan Insurance Corporation (FSLIC), as receiver for North Kansas Savings Association.

The appellees' cause of action for compensatory and punitive damages at issue in this appeal arose from the business relationship between the appellees and North Kansas Savings Association from 1972 through 1974. The focal point was a plan for the design, development, and marketing of pre-stressed steel apartment buildings. The appellees were induced by the appellant North Kansas Savings Association, through its officers, to participate in this business enterprise.

North Kansas was affiliated with a number of corporations

which had dealings, directly and indirectly, with the appellees. The most important of these affiliates and subsidiaries were North Kansas Service Corporation and Trans-Western, Inc. North Kansas Service Corporation, a Kansas corporation, was a wholly owned subsidiary of North Kansas Savings Association. The service corporation was authorized to engage in business activities and "risk ventures" which the savings and loan association could not undertake on its own behalf.

Although Trans-Western, Inc. was created for the purpose of becoming the holding company of North Kansas Savings Association, that plan never came about. At the time North Kansas Savings Association applied for approval of Trans-Western as its holding company, federal regulations provided only two percent of the total assets of the savings association could be invested in risk ventures of a related service corporation and its subsidiaries. North Kansas Savings Association had greatly exceeded the two percent limitation. The reason given for the denial of Trans-Western's application for holding company status by the Federal Home Loan Bank Board was that no certified audit could be provided.

Against this background, while North Kansas was creating an interlocking corporate pyramid, Michael Wayland became acquainted with Roger Chester, president of North Kansas Savings Association. Wayland did business as Wayland Construction Company. In 1972 Wayland was constructing a steel building to house a mobile home manufacturing plant in Lincoln, Kansas. Wayland had been in the construction business since early 1956. He had become an authorized Behlen Steel distributor in 1965. In addition, Wayland was a fifty percent owner in Colby Steel Corporation, which was also an authorized Behlen Steel distributorship. Colby Steel engaged in marketing and installing grain handling equipment.

After seeing the Wayland project in Lincoln, Chester became interested in using the Behlen free-standing structural steel concept in the design and construction of apartment complexes. Chester believed spiraling lumber and construction costs made such buildings cost efficient. Chester proposed Wayland build a "pilot project" as a "showcase" to demonstrate design and cost efficiency in selling packages to investors, developers, and contractors.

At that time, Chester was working with Carl VanDalsem on a multimillion dollar gasoline filling station project. At a meeting held at the offices of North Kansas in Beloit, Wayland became reacquainted with VanDalsem, whom he had previously known in school. Both Chester and VanDalsem became interested in the plan for the nationwide marketing of steel apartment buildings. Chester urged Wayland and VanDalsem to incorporate as a vehicle to facilitate that plan. They complied by incorporating W-V Enterprises on January 12, 1973. The incorporators were Michael Wayland, Carl VanDalsem and their spouses.

After a plan to build the pilot structure in Colby fell through, Concordia was selected as the site. An appraisal indicated the project was feasible there. Chester promised Wayland North Kansas would provide interim and long-term financing for the construction. In spite of Chester's assurances of complete financing, on March 1, 1973, North Kansas issued a commitment for only permanent financing. Thereafter Wayland and VanDalsem made arrangements with Citizens Savings Association for interim construction financing in the amount of $300,000. Citizens Savings agreed to provide the interim construction financing conditioned on the reissuance of the March 1 commitment letter from North Kansas Savings Association to provide the long-term, take-out financing flowing directly to Citizens Savings. This resulted in a second commitment letter, dated March 14, 1973, which provided upon completion of the project North Kansas Savings Association would provide $300,000 in permanent financing. The commitment was restricted. W-V paid a commitment fee of $3,000 to North Kansas. The real property in Concordia was purchased by W-V for $7,500 on March 6, 1973, and the project began shortly thereafter. Wayland informed North Kansas he estimated the cost of the Concordia project would be $295,000 for materials alone. According to Chester, W-V would receive a six percent development fee and a six percent construction fee when the project was sold.

At the request of Roger Chester, and to accommodate his plan that the Concordia complex be a "showcase" for potential investors, Wayland redesigned it to give it a more attractive mansard roof. This change increased the cost by $10,000 per unit. Chester orally committed North Kansas to provide additional financing in the amount of $30,000.

Wayland and the employees of Wayland Construction Company devoted approximately one and one-half years to the drafting of some twenty-one designs for structural steel apartment complexes in preparation for North Kansas' nationwide marketing plan.

On June 20, 1983, just three months after issuing its commitment letter, Carl VanDalsem was informed by Don Tompkins, vice-president of North Kansas, that North Kansas might not be in a position financially to provide any financing on the Concordia project. When Wayland confronted Chester, he was informed there was no basis for the letter. Wayland was assured by Chester if the apartments were not sold to one of Chester's investor contacts by the time they were completed, North Kansas would place the Concordia project in one of its subsidiary or affiliated corporations.

In the meantime Carl VanDalsem had gone bankrupt. In order to keep North Kansas informed of all developments Wayland informed Dennis Vogan, of North Kansas, by letter on September 10, 1973, that Carl VanDalsem was no longer financially capable of carrying on his role in W-V. Wayland further stated he was not willing to continue the project unless North Kansas would stand behind its commitment of $330,000 at a maximum rate of nine and one-quarter percent. Additionally, in a memorandum to the file, dated September 26, 1973, Dennis Vogan referred to a telephone conversation with Mike Wayland in which he stated, "Mike indicated that Carl VanDalsem was completely out of the picture . . . . Conversation ended on good standing saying we would be in touch." Thereafter, on October 5, 1973, W-V paid an additional fee of $100 to North Kansas Savings as consideration for an extension of the permanent loan commitment.

On December 18, 1973, Vogan informed Wayland the appraisal of the Concordia apartments obtained in November, 1973, reflected a value of only $300,000 and therefore a loan in the amount of $330,000 was not feasible. On December 26, Don Tompkins, vice-president of North Kansas, wrote: "Due to substantial changes in W-V, Inc., after our commitment letter of March 14, 1973, . . . North Kansas Savings Association is no longer in a position to purchase the permanent [financing]." North Kansas' waffling on its commitment was very unsettling to Wayland.

A meeting to resolve the financing delays was held on December 28, 1973, at Citizens Savings Association, but no resolution was reached. A second meeting was held on January 22, 1974, in the home offices of North Kansas. At that meeting, the parties reached an understanding, which was memorialized in a letter dated January 28, 1974, from W-V's attorney to North Kansas' attorney. According to the January 28 letter the property would be appraised by a member of the Appraisal Institute, an MAI appraiser. North Kansas would then loan eighty percent of the appraised value not to exceed $330,000. Wayland interpreted this to be reaffirmation of the previous commitment with the appraisal requirement only necessary red tape. He selected two appraisers who appraised the property at $325,000. Then came the surprise. North Kansas advised Wayland on February 15, 1974, it would lend him only eighty percent of the $325,000 appraised value or $260,000.

Wayland did not accept the offer of $260,000 in permanent financing. Instead, he attempted to extricate himself from the problems by offering to sell the Concordia project. On February 13, 1974, he made a payment of $2,500 to Interstate Business Marketing, Inc., Pueblo, Colorado, to retain its services for the sale of the project. Interstate undertook an extensive nationwide effort to sell the project. Wayland also contacted Green Realtors in Overland Park, Kansas, regarding the rental and sale of the apartments. In addition, officers of Citizens Savings undertook to rent the apartments. In the meantime, Wayland also attempted to obtain financing from numerous other sources and in his efforts to remain solvent he sold some of his own property and obtained a $100,000 loan from the Small Business Administration (SBA). This money was used to pay the out-of-pocket construction costs for the Concordia project and to pay off material and subcontractors' liens to make it merchantable. The total cost of the project turned out to be $422,000. Only $284,000 had been received from the interim construction lender, Citizens Savings. There is no evidence North Kansas ever attempted to sell the project or obtain a substitute lender.

Wayland's efforts to sell were unsuccessful. On February 20, 1974, Wayland received notice from Citizens Savings the construction loan, plus interest, was due; by August 7, 1974, Citizens Savings laid claim to the rental payments; and on April 5, 1976,

Citizens Savings filed a foreclosure action against the project. Other suits relating to the Concordia project were brought against Wayland by Bostwick Steel Lathe Company, the Pascoe Steel Company, and Behlen Manufacturing Company. The SBA foreclosed, resulting in the sale of the mortgaged equipment (all of the equipment of the Wayland Construction Company) at a substantial loss. In addition, Wayland lost his Behlen distributorship, suffered damage to his credit and business reputation, and suffered extreme financial pressures. Wayland became severely depressed, and required several periods of hospitalization, including electroshock therapy treatments. Then, to cap the climax, Wayland's wife of twenty-five years divorced him.

Wayland brought suit against North Kansas Savings Association on January 21, 1976. A jury returned a verdict in his favor in the amount of $1,245,944 in compensatory damages and awarded punitive damages of $250,000. The FSLIC as receiver for North Kansas appealed.

The appellant first argues the letter of January 28, 1974, by W-V's attorney to North Kansas's attorney, memorializing a meeting of the parties on January 22, 1974, was a new and fully integrated final agreement of the parties and the trial court erred in admitting parol evidence to contradict its terms.

The January 22, 1974, meeting was requested by Michael Wayland's attorney. The purpose of the meeting was to determine why North Kansas was stalling on honoring its written commitment to provide permanent financing for the Concordia apartment project. North Kansas contended the loss of Carl VanDalsem's interest in W-V had created "substantial changes" in W-V, and thus released North Kansas from its obligation to provide permanent financing. The evidence at trial indicated this was a pretext. That evidence consisted of statements by and communications with officers of North Kansas and Trans-Western, Inc., which disclosed Trans-Western had attempted to become the holding company for North Kansas. Its application was denied by the Federal Home Loan Bank Board because no certified audit could be provided. Also, in June, 1973, one officer informed W-V that North Kansas was experiencing "tight money problems" and it was uncertain whether it could fulfill its commitment to provide permanent financing for W-V. The evidence also showed Mike Wayland had informed North Kansas Carl

VanDalsem was no longer associated with W-V due to his impending bankruptcy as early as June 1973, and on October 4, 1973, North Kansas extended its financing commitment; this occurred over a week after North Kansas' September 26 acknowledgment of the disassociation of VanDalsem from W-V. Thus, changes in W-V were not the cause of North Kansas' backing out on its commitment.

The letter memorializing the January 22 meeting noted six factors upon which the permanent financing of W-V was contingent. These factors were: (1) W-V would provide North Kansas with a MAI appraisal of the Concordia apartment project by an appraiser approved by North Kansas; (2) the appraisal would be submitted to the North Kansas Board of Directors along with personal financial statements of Mike Wayland and his brother, John, and their tax returns for the preceding three years; (3) subject to the board of directors' approval North Kansas would loan to W-V a sum equal to eighty percent of the appraised value of the project, such sum not to exceed $330,000 and at an interest rate not to exceed nine and one-quarter percent; (4) the board of directors would render its decision within three days after the appraisal and other information was submitted; (5) the shareholders of W-V would submit an affidavit indicating Carl Van-Dalsem had no further interest in W-V; (6) the mortgage title insurance would be taken care of by Citizens Savings Association, which had provided the interim financing.

All the conditions were met by W-V until a problem arose over the MAI appraisal. The parties had originally agreed to $300,000 financing on March 14, 1973, plus an additional $30,000 for the mansard roof design change. Thus, W-V was entitled to $330,000. The MAI appraisal of the complex was $325,000. The board of directors of North Kansas calculated eighty percent of the $325,000, pursuant to the letter of January 28, 1974, and offered to provide W-V $260,000 financing, $70,000 short of the previous commitments. The issue then is whether the letter of January 28, 1974, constituted a novation or a modification of the March 14, 1973, agreement.

Appellant contends the January 28 letter is a complete new agreement of the parties. The appellees counter that the construction of the letter was a question of fact and therefore was properly submitted to the jury and decided. Appellees' argument

is erroneous. While an *oral* agreement, which changes a prior written agreement, is a question of fact to be submitted to a jury, the construction of a *written* instrument purported to be a novation is a question of law for the court. *Davenport v. Dickson,* 211 Kan. 306, 311-12, 507 P.2d 301 (1973). See also *Belger Cartage Serv., Inc. v. Holland Constr. Co.,* 224 Kan. 320, 330, 582 P.2d 1111 (1978); *Coonrod & Walz Constr. Co., Inc. v. Motel Enterprises, Inc., et al.,* 217 Kan. 63, Syl. ¶ 2, 535 P.2d 971 (1975); and *Alexander v.Wehkamp,* 171 Kan. 285, 290, 232 P.2d 440 (1951). Further, while a question of fact determined by the jury may not be redecided by the court on appeal, the construction of a written instrument, due to its status as a question of law, may be construed and its legal effect determined by the appellate court. *Stanfield v. Osborne Industries, Inc.,* 232 Kan. 197, Syl. ¶ 1, 654 P.2d 917 (1982).

W-V, however, also argues the point in the alternative, contending that if the construction was in fact a question of law for the court, but was erroneously submitted to the jury at trial, North Kansas cannot raise the issue on appeal and request this court to reconstrue it, since the issue was presented to the jury upon North Kansas' request. This argument is correct. At trial, North Kansas contended the validity of the January 28, 1974, agreement was a question of fact for presentation to the jury. The trial court acceded to its request. Where a party persuades a court to proceed in a particular way and invites a particular ruling, the party is precluded from asserting the issue on appeal. *Grimm v. Pallesen,* 215 Kan. 660, Syl. ¶ 3, 527 P.2d 978 (1974). Thus, the jury's determination there was no novation will stand.

North Kansas next contends the January 28, 1974, letter was a modification of its commitment since the intent of the parties to modify the March 14 commitment "may be implied from their conduct." *Byers Transp. Co. v. Fourth Nat. Bank & Trust Co., Wichita,* 333 F.2d 822, 825 (10th Cir. 1964). Appellant's reliance on *Byers* is misplaced. In *Byers* the parties agreed to a new and later closing date. The parties acted according to the new date with no one attempting to close as originally agreed. In the instant case, while both North Kansas and W-V complied with the new requirements of the January 28 letter, they did not agree the loan commitment had changed. W-V continued to act ac-

cording to the original commitment of March 14, 1973. We conclude the letter was not a modification.

Appellant next argues the trial court erred in admitting parol evidence to explain the January 28 letter. At trial the court ruled W-V had introduced sufficient evidence of mutual mistake to admit parol evidence. The mutual mistake of the parties consisted of the meaning of "appraisal" in calculating the loan amount. Appellees understood the appraisal was mere red tape for the purpose of substantiating the amount of the loan for examiners while appellant contends the appraisal controlled the loan amount. This court has stated the rule pertaining to the admission of parol evidence in the case of mutual mistake as follows:

"In order for parties to form a binding contract, there must be a meeting of the minds as to all essential terms. [Citation omitted.] As between the original parties to a contract parol evidence to show mutual mistake may be introduced in an action to show the nonexistence of a binding contract." *Sidwell Oil & Gas Co. v. Loyd,* 230 Kan. 77, 79, 630 P.2d 1107 (1981).

North Kansas asserts even though mutual mistake exists parol evidence should not have been admitted since "appraisal" is not an ambiguous term. Appellant's argument is erroneous. The evidence was admissible on the issue of either mutual mistake or ambiguity. Here both exist. "The law is well settled that where ambiguity exists in a document evidence is admissible as an aid to its interpretation." *Mobile Acres, Inc. v. Kurata,* 211 Kan. 833, 839, 508 P.2d 889 (1973). See also *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 457 P.2d 691 (1969), and *Culp v. Bloss,* 203 Kan. 714, 457 P.2d 154 (1969). Appellant's brief sets forth a series of confusing definitions, sufficiently illustrating the ambiguity inherent in the term of "appraisal." The record also indicates the uncertainty of the witnesses as to the exact meaning of the term. Even the MAI appraisers testified the term had a variety of meanings. Parol evidence was appropriate to clarify the ambiguous term "appraisal" and to resolve the issue of mutual mistake.

For its next issue North Kansas argues there was insufficient evidence for the trial court to submit fraud and the tort of outrage to the jury. The proof of fraud consisted of North Kansas' inducement of Mike Wayland to undertake construction of a "showcase" apartment complex to be used as a pilot project to sell to the appellant's "investor contacts." North Kansas prom-

ised to provide both the interim construction financing and the long-term permanent financing for the ultimate purchasers. North Kansas also promised that if the project could not be sold to one of its "investor contacts" it would sell the project to one of its affiliated companies. North Kansas represented that the Concordia project would be the first "showcase" project in a nationwide marketing scheme. North Kansas encouraged Wayland to incorporate, to purchase land for the Concordia project, to develop plans for some twenty-one other complexes, to obligate himself on a construction loan for the purpose of the project, and to complete construction of the Concordia project at a cost substantially above initial estimates because of the special roof requested by the defendant. Wayland had no intention or desire to own, manage, or operate an apartment complex as a personal or business investment absent North Kansas' representations it would find a purchaser or take over the operation of the project. In spite of the representations made by North Kansas, and Wayland's reliance and performance thereon, North Kansas did not honor its numerous promises. It provided neither the interim construction financing nor the permanent financing. It did not sell the Concordia project to its "investor contacts"; it did not have one of its subsidiary or affiliated companies purchase the project; and it did not assist in the development and promotion of a nationwide marketing scheme. The final consequence of the appellees' business dealings with appellant North Kansas was foreclosure by the interim construction lender and the sale of the assets of Wayland Construction Company.

North Kansas contends its continuous promises to Mike Wayland were mere "puffing" upon which W-V had no legal right to rely. Appellant argues Chester's statements should have been recognized by Wayland as hopeful opinions regarding the potential for a national marketing scheme for projects such as the Concordia project, and these opinions never rose to the level of misrepresentations of material fact.

The jury in this case determined North Kansas was guilty of fraud. This court has discussed fraud many times and in doing so has declined to specifically define fraud. In *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 64, 643 P.2d 100 (1982), this court quoted 37 C.J.S., Fraud § 1, p. 204:

"While the broad outlines of fraud have been indicated by regarding it as

including any cunning, deception, or artifice used, in violation of a legal or equitable duty, to circumvent, cheat, or deceive another, the forms it may assume and the means by which it may be practiced are as multifarious as human ingenuity can devise, and the courts consider it unwise or impossible to formulate an exact, definite, and all inclusive definition thereof. It is synonymous with, or closely allied to, other terms indicating positive and intentional wrongdoing, but is distinguishable from mistake and negligence."

See also *Citizens State Bank v. Gilmore,* 226 Kan. 662, 667, 603 P.2d 605 (1979).

The law in Kansas concerning proof of fraud was discussed in *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980):

"We have held fraud is never presumed and must be proven by clear and convincing evidence. [Citations omitted.] The term 'clear and convincing evidence' means:

" '[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.' *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979).

. . . .

" 'The existence of fraud is ordinarily a question of fact.' "

A verdict for fraud cannot be disturbed on appeal if there is substantial evidence in the record to support it. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 77, 596 P.2d 816 (1979). We find substantial evidence in the record to support the jury's verdict for fraud. This case is similar to *Augusta Bank & Trust Co.,* 231 Kan. 52. There Broomfield, a dirt mover, was induced by the bank to put his time and money into a project. The promised financing never came through and Broomfield was ultimately financially ruined. The supreme court stated:

"Viewing all the evidence and inferences therefrom in the light most favorable to Broomfield, we cannot escape the conclusion that there is substantial evidence to support the jury's awards. The landowners led Broomfield down the 'primrose path.' " 231 Kan. at 64.

Mike Wayland was a reputable and honest steel distributor and construction contractor. North Kansas' promises of financing induced him to invest in and build the Concordia complex. The promised financing never occurred. Wayland was led to change his position by North Kansas' false representations. There is

sufficient evidence of fraud to go to the jury. This issue is without merit.

North Kansas also contends W-V failed to present sufficient evidence to support recovery for the tort of outrage. In *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, Syl. ¶ 1, 529 P.2d 104 (1974), this court recognized the tort of outrage when it held that "[a] creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm." The court reversed the trial court's order granting the defendant's motion for directed verdict and ordered a new trial. Although Kansas recognizes the tort of outrage, *Dawson* and *Gomez v. Hug*, 7 Kan. App. 2d 603, 645 P.2d 916, *rev. denied* 231 Kan. 800 (1982), no Kansas appellate court has since affirmed a jury verdict for a plaintiff on that theory. See *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175 (1981), (insulting remarks made by a doctor to a patient being prepared for surgery); *Wiehe v. Kukal*, 225 Kan. 478, 592 P.2d 860 (1979), (threatening the plaintiff's husband with a pitchfork); *Vespa v. Safety Fed. Savings & Loan Ass'n*, 219 Kan. 578, 549 P.2d 878 (1976), (harassment of a debtor); *Dotson v. McLaughlin*, 216 Kan. 201, 531 P.2d 1 (1975), (harassment of a debtor); *Young v. Hecht*, 3 Kan. App. 2d 510, 597 P.2d 682, *rev. denied* 226 Kan. 510 (1979), (alleged unethical conduct by an attorney); and *Bradshaw v. Swagerty*, 1 Kan. App. 2d 213, 563 P.2d 511 (1977), (collection attorney calling one of his client's debtors a "bastard, nigger, and knot-headed boy").

Liability may be predicated on the tort of outrage "only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts v. Saylor*, 230 Kan. at 293. In light of our previous decisions, we hold North Kansas' behavior, although fraudulent and deceptive, does not meet the definition of outrageous as stated in *Saylor*. The lower court, therefore, erred in submitting the issue to the jury. The error, however, is harmless in view of our action on emotional distress later herein and since punitive damages can be awarded on either fraud or outrage.

The appellant next argues the trial court erred in submitting the issue of tortious breach of contract to the jury since the issue

of negligence was not properly raised in appellees' pleadings. In light of our ruling on the issue of fraud we need not discuss this issue since any error is harmless.

North Kansas next argues the damage verdict is not supported by the evidence. Appellant initially contends W-V breached its legal duty to mitigate its damages. It is true we have held a party "is bound to protect himself if he can do so with reasonable exertion or at trifling expense and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided . . . ." *In re Estate of Stannard*, 179 Kan. 394, 397, 295 P.2d 610 (1956). Here, North Kansas ultimately offered W-V a loan of $260,000 after having previously made a commitment of $330,000. Appellant argues W-V was obligated under its duty to mitigate to take the $260,000 and seek alternate financing for the $70,000 shortage. W-V refused the lesser amount because it would not pay off the interim loan to Citizens Savings Association and Wayland pledged all of the equipment of Wayland Construction Company as security to obtain loans for construction costs. Thus, had W-V accepted the lesser amount it would have remained delinquent in its loan from Citizens and subject to foreclosure. We have held there is no obligation to mitigate damages if the mitigation involves dealing with the breaching party. See *Cain v. Grosshans & Petersen, Inc.*, 196 Kan. 497, 413 P.2d 98 (1966). We hold under the circumstances of this case W-V had no obligation to accept the lesser loan from North Kansas.

Appellant next contends the damage award attributable to loss of future profits is speculative and not supported by the record. In *Butler v. Westgate State Bank*, 226 Kan. 581, 582, 602 P.2d 1276 (1979), this court summarized the rules concerning loss of profits and stated:

" 'This court follows the general rule that loss of profits resulting from a breach of contract may be recovered as damages when such profits are proved with reasonable certainty, and when they may reasonably be considered to have been within the contemplation of the parties. [Citations omitted.] Recovery for loss of profits caused by a breach of contract depends upon the facts and circumstances of each particular case.' " (quoting *Vickers v. Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 [1974])

In *Butler*, which involved a new business, we held the evidence of loss of profits, which consisted of one person's testimony, to be too speculative. In *Vickers*, this court held the

evidence of loss of profits was not speculative, since there were "techniques available . . . by which profits [could] be calculated with reasonable certainty . . . ." 213 Kan. at 620. In the instant case, the loss of future profits was claimed for the loss of the Behlen Steel distributorship, which Mike Wayland had been granted, and the financial demise of Wayland Construction Company. Both were established businesses whose total gross sales in 1970 were $198,787; in 1971 they were $176,759; and in 1972 they were $133,392. Appellant relies upon Wayland Construction Company's net taxable income alone to show the loss of profits granted by the jury was excessive. Other figures, including the gross sales, were presented to the jury at trial and demonstrate that the $500,000 award for loss of profits is not speculative. Appellee made no claim for loss of profits of W-V. This issue is without merit.

Appellant next argues the record does not support a damage award for nervous exhaustion and emotional breakdown and that the award of $400,000 is excessive. Our examination of the record indicates the jury award for damages in this category is $200,000 rather than $400,000 as stated by appellant.

North Kansas contends there is no evidence indicating it caused the emotional breakdown of Michael Wayland. W-V argues its evidence established Wayland's emotional problems resulted directly from his dealings with North Kansas. The testimony does show Wayland suffered severe emotional problems at the time of his financial losses from the failure of the Concordia project, but there was also evidence of domestic discord, which could also have been the cause of his emotional distress. The evidence does not point to specific acts of North Kansas which inflicted emotional distress on Wayland. This court has held the law involving emotional distress has

"two threshold requirements which must be met . . . [These are]: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." Roberts v. Saylor, 230 Kan. 292-30.

The purpose of these stringent requirements is to protect "defendants against fictitious claims and litigation based on trivialities . . . ." 230 Kan. at 293. W-V has not met these requirements. In another Kansas case involving damages for nervous exhaustion and emotional breakdown this court held:

"It cannot be disputed that the appellants suffered a tremendous amount of emotional and physical stress and anxiety . . . . Despite this the appellants maintain that all of the emotional and physical maladies suffered by them . . . have been caused solely by [the acts of the defendant] . . . . This claim is not supported by the appellants' evidence." *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 277-78, 662 P.2d 1214 (1983).

In *Hoard,* the parents of a teenage girl were erroneously informed by a hospital official that their daughter had died as a result of massive injuries incurred in an automobile accident. The parents began making funeral arrangements and as they were leaving the hospital, it was discovered their daughter was still alive but in another hospital and the fatality erroneously identified as their daughter was one of her friends. Both girls had been passengers in the same car during the auto accident. While the shock and distress created by the mistaken identity was terrible, we held it was not sufficient to support a damage award for emotional distress.

In the instant case, while Wayland was financially ruined by his activities with North Kansas, there is no evidence in the record of specific acts of North Kansas which inflicted the emotional distress on Wayland. The damages resulting from Wayland's emotional problems are not recoverable. To find otherwise would permit recovery for every individual who suffered emotional problems after a substantial financial loss. Clearly that was not the intent of this court in *Saylor.* The trial court, therefore, erred in submitting the issue to the jury and the $200,000 award is without basis and is set aside.

Appellant's final damage issue is that the trial court erred in awarding punitive damages. Punitive damages may not be recovered for a breach of contract unless an independent tort is also established. See *Atkinson v. Orkin Exterminating Co.,* 5 Kan. App. 2d 739, 625 P.2d 505, *aff'd* 230 Kan. 277, 634 P.2d 1071 (1981). North Kansas was guilty of fraud. That finding supports the punitive damage award. Whenever fraud, malice or gross negligence are present in a case, punitive damages are proper as a method of punishing the wrongdoer. A jury may consider costs of litigation, financial condition of the tortfeasors and the grossness of the conduct of the party in awarding punitive damages. Under such criteria an award of $250,000 punitive damages does not shock the conscience of this court and is upheld.

There remains the final issue of security for appellees' judgment. The questions presented are whether the appellant should be required to post a supersedeas bond, the validity of the order of attachment, and the extension of the judgment lien to real estate owned by Rockwood, Inc., a subsidiary of North Kansas. The procedural facts are complicated. W-V asked for North Kansas to be required to post a supersedeas bond pursuant to Kansas to be required to post a supersedeas bond pursuant to K.S.A. 60-262(d) pending its appeal. A stay of execution without bond has been in effect since July 29, 1982. The Court of Appeals extended the stay on October 25, 1982. The appeal was transferred to this court on November 9, 1982, with this caveat:

"[T]he previously granted stay of execution of judgment without bond be continued in force and the attachment orders remain in effect until further order of this Court."

We then remanded the case to the district court for the limited purpose of conducting proceedings pertaining to the validity of the attachment order under K.S.A. 1982 Supp. 60-712. The district court made findings of fact and conclusions of law upholding the attachment order and returned the case to this court.

Let us first consider the supersedeas bond issue. The FSLIC argues it should not be required to post a bond pursuant to federal law which provides no security may be required against a United States instrumentality in any court proceeding. See 28 U.S.C. § 2408. This argument is erroneous. 28 U.S.C. § 2408 does not contemplate the situation presented in this case. This statute applies only in cases where the United States or its agencies institute the action. The wording of the statute discloses its purpose: "Costs taxable . . . shall be paid out of the contingent fund of the department or agency which directed the proceedings to be instituted." In the present case costs taxable will not be paid out of the funds of the FSLIC but rather out of the insurance fund FSLIC holds for North Kansas and revenue received from liquidating North Kansas.

FSLIC also argues it should not be required to post a bond because it is stepping into the shoes of North Kansas, and North Kansas was not required to post a bond. When the issue first arose in the district court, appellees argued K.S.A. 60-262(d), which requires a supersedeas bond to stay execution upon ap-

peal, should be imposed. The trial court held this statute was applicable to North Kansas. K.S.A. 60-262(*e*), however, is the applicable law. It provides when an appeal is taken "by direction of any department of the state and the operation or enforcement of the judgment is stayed, no bond, obligation, or other security shall be required from the [appellant]." K.S.A. 60-262(*e*) is applicable because the Kansas Commissioner of the Savings and Loan Department directed North Kansas "to pursue this appeal." The Court of Appeals reversed the trial court on October 25, 1982. Upon the substitution by this court of the FSLIC for North Kansas, it succeeded to all "rights, titles, powers, and privileges" of North Kansas. See 12 C.F.R. § 547.7 (1983). We conclude FSLIC is not required to post a supersedeas bond to stay execution pending an appeal, pursuant to K.S.A. 60-262(*e*).

FSLIC next argues the attachment order of the district court is invalid. It initially contends the district court was without jurisdiction to issue the order since a notice of appeal had already been filed by North Kansas. This argument is without merit. The order of attachment was filed prior to filing of the docketing statement on October 19, 1982. Thus, the district court had jurisdiction to enter the order of attachment. See *Carson v. Eberth,* 3 Kan. App. 2d 183, 592 P.2d 113 (1979).

The attachment was ordered pursuant to K.S.A. 60-701(5) and (6). FSLIC contends the trial court erred in imposing K.S.A. 60-701(6), which states:

"[T]he plaintiffs  .  .  .  may have, as an incident to the relief sought, one or more attachments against the property of the defendant, or that of any one or more of several defendants, when the defendant whose property is to be attached:

.  .  .  .

"(6) fraudulently contracted the debt or fraudulently incurred the liability."

FSLIC argues North Kansas did not fraudulently contract with W-V. That issue has been decided herein adverse to appellant. The purpose of the statute is to prevent disposal of a defendant's property before a plaintiff may obtain a judgment when the defendant has proven to be dishonest in its past conduct. See 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-701 (1979). This purpose likewise extends to an appeal. The trial court here had a final jury verdict indicating fraud on the part of North Kansas. The purpose of the statute would be defeated if the court were

required to wait for disposition of the issue on appeal before ordering attachment.

FSLIC additionally argues it did not engage in fraudulent conduct; thus upon the court's order substituting it as a party the attachment should have been released. K.S.A. 60-701(6) does not contemplate such a situation. The only authority cited by either party on this point is 12 C.F.R. § 569a.7(a)(2) (1983), which mandates that the FSLIC must assume the liabilities and just claims against an insolvent association as they exist at the time of declaring the association insolvent. The law requiring FSLIC as receiver to step into the shoes of North Kansas shoulders FSLIC with all the liabilities of its predecessor, including its liabilities for fraudulent conduct.

The FSLIC further claims it is prejudiced by the continuation of the attachment order because the order interferes with its liquidation of North Kansas. The facts show, however, that during the hearing on February 15, 1983, the trial court suggested a release of the orders of attachment if the receiver would place the funds in escrow and continue to recognize the priority lien on the proceeds arising from the payment of the attached indebtedness. Appellees informed the court of appellees' willingness to consider such an arrangement. However, FSLIC took no steps to comply. In addition, FSLIC made no attempt to seek release of the attachments under K.S.A. 1982 Supp. 60-707, which provides for a discharge of attachment upon the posting of a bond by defendant.

The FSLIC also suggests dissolution of the order of attachment would have no adverse effect on the appellees because of FSLIC's adherence to its fiduciary obligation to liquidate North Kansas in accordance with federally mandated guidelines. Not so. If the orders of attachment are rescinded, the status of the appellees will be changed from that of secured to unsecured creditors, thereby reducing the collectability of their judgment. In this regard, the trial court held as follows:

"The attachment orders are necessary to protect the plaintiffs as against the receiver, FSLIC. The result of a dissolution of the attachment would be to reduce the plaintiffs' judgment to the position of an unsecured creditor and a 60% pro-rata payment in satisfaction of the judgment."

The prejudice to the appellees by dismissing the attachment

order is therefore substantial. We hold the attachment order valid.

Appellees next request this court to rule their judgment liens on real property extend to certain real property owned by Rockwood, Inc., a subsidiary of North Kansas Service Corporation, which, in turn, is a subsidiary of North Kansas Savings Association. This issue was not before the trial court and cannot be raised for the first time on appeal. See *State v. Puckett*, 230 Kan. 596, 600-601, 640 P.2d 1198 (1982).

The judgment of the trial court is modified by reduction of the compensatory damages award from $1,245,944 to $1,045,944 and affirmed as modified.